IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JAMES A. BURNS,<br><br>      Plaintiff,<br>v.<br><br>GRANITE SCHOOL DISTRICT,<br><br>      Defendant. | **MEMORANDUM DECISION &<br>ORDER**<br><br>Case No.  2:11-CV-00072-RJS<br><br>District Judge Robert J. Shelby |

   Plaintiff James Burns claims that Defendant Granite School District discriminated against him on the basis of his age and gender when it dismissed Mr. Burns from a part-time teaching position.  Both parties move for summary judgment in their favor.  Having found no genuine issues of material fact, the court **GRANTS** Granite's Motion for Summary Judgment.[1] Accordingly, Mr. Burns's Motion for Summary Judgment is **DENIED**.[2]

## BACKGROUND

   Mr. Burns has been, and remains, an employee of Granite.  He taught fifth grade at Oquirrh Hills Elementary School and has achieved career status in that position.  Mr. Burns also worked in an additional part-time capacity teaching English as a Second Language (ESL) through the District's "Granite Peaks Community Education Program" (Granite Peaks).  From 2008 to 2010, Mr. Burns worked for Granite Peaks as an hourly ESL teacher at the Kearns High

---

[1] Dkt. No. 17.

[2] Dkt. No. 19.

School campus.[3] This lawsuit arises out of Granite School District's decision to terminate Mr. Burns's ESL position in the summer of 2010. Mr. Burns's job as a fifth grade teacher is not the subject of any of his claims in this action.

## I.    Organization and Management of Granite Peaks

Granite Peaks provided community and adult education classes during the evening hours. Granite Peaks offered six levels of instruction for its ESL students. At Level One, students often lacked the ability to communicate effectively in English. Because students must pass a test to graduate to the next level of coursework, communicative skills naturally increased with each passing level. Enrollment numbers tended to drop off at Level Three or Level Four, as students increased their ability to communicate in English. Historically, Level Five and Level Six courses experienced the lowest retention rates. Lower retention rates were attributed to a number of factors, including students' attachment to the teacher, increased language proficiency, new employment opportunities, and other life changes. At the time of his termination, Mr. Burns taught Level Six students at the Kearns Campus.

Cathy Adamson supervised the Granite Peaks Kearns Campus from 2008 to 2010. Ms. Adamson supervised a number of teachers during the relevant time period, including Mr. Burns, Tara Black, Jason Roberts, Susie Gaily, Jennifer Hutchinson, and Connie Linkmeyer. Ms. Adamson reportedly had a rigid, hands-on approach to management.[4] Ms. Adamson testified that she assigned teachers to different levels based upon their attachment with students.[5] As part

---

[3] The parties dispute the status of that employment. Granite argues that Mr. Burns was a temporary, at-will employee. Cathy Adamson, who is the Coordinator for Granite Peaks at the Kearns campus, testified that there were no contract teachers at Granite Peaks. Dkt. No. 19-2, Ex. Q, at 79:10. Mr. Burns stated that he signed an annual contract every year and believed he was a contract teacher. *Id.*, Ex. T. But besides Mr. Burns's subjective belief, he has presented no admissible evidence to establish that he was not an at-will employee. In any event, Mr. Burns does not bring any contract claims and the court therefore finds that the existence of a contract is not a material fact.

[4] Dkt. No. 19-2, Ex. O, at 6:20-21; Dkt. No. 18-1, Ex. B, at 8-9, 12.

[5] Dkt. No. 19-2, Ex. Q, at 31:13-19.

of her duties, Ms. Adamson informed the teachers at staff meetings that student attendance was important.  Although some teachers occasionally permitted their students to leave class early, Ms. Adamson testified that the program's policy required students to stay until nine o'clock.[6]

## II.    Relationship between Mr. Burns and Ms. Adamson

There appeared to be some friction between Mr. Burns and Ms. Adamson before Mr. Burns's position was terminated.  In April 2009, Mr. Burns dismissed his class at 8:45 p.m.  As he was leaving, Ms. Gaily, another teacher in the program, told Mr. Burns: "[T]his is an official warning, class does not get out until 9:00 p.m."[7]  Ms. Adamson reportedly instructed Ms. Gaily to give Mr. Burns this warning.  Later, Ms. Adamson discussed the incident with Mr. Burns and acknowledged that Ms. Gaily had overstepped her bounds by admonishing Mr. Burns.  Mr. Burns also filed an EEOC complaint in response to the incident.  Although the parties dispute the issue, Granite maintains that it lacked knowledge of the EEOC complaint during the period at issue in this lawsuit, and that it did not communicate to Ms. Adamson that Mr. Burns had filed an action against her.

Attendance at Granite Peaks was dropping in 2010.  Although five teachers worked at the Kearns campus, Ms. Hutchinson agreed to take a temporary leave of absence during the spring term in 2010 because of declining enrollment figures.  Around the same time, Ms. Adamson assigned Ms. Black to teach Level Five and Mr. Burns to Level Six.  Because Level Five and Level Six had low enrollment and poor retention rates, Ms. Adamson combined the classes for

---

[6] *Id.*, Ex. Q, at 6:16-19.

[7] *Id.*, Ex. U, at 4-5.

the month of June.[8]  In lieu of terminating one of the two teachers due to low enrollment, Ms.

Adamson asked Ms. Black and Mr. Burns to trade off teaching every other week.[9]

On May 27, 2010, Mr. Burns sent an email to Ms. Adamson in response to her decision

to combine classes.[10]  Mr. Burns stated that he and Ms. Black were blameless for the fewer

number of students in upper-level classes.  He described Mr. Roberts as a junior teacher in the

program and indicated that students should be transferred from Mr. Roberts's classes to the

upper level courses.  Mr. Burns asked why Ms. Gaily should retain Levels One, Two, and Three

without a cut in her hours.  Although Mr. Burns did not mention age or gender, he characterized

Ms. Adamson's decision as "blatant discrimination" and indicated that he intended to file an

EEOC complaint if Ms. Adamson did not change her decision.  Mr. Burns did file a complaint

with the Utah Antidiscrimination & Labor Division a few days later on June 2, 2010.

Mr. Burns sent a second email to Ms. Adamson on June 9, 2010.[11]  Mr. Burns indicated

the email was in response to her request for "opinions, suggestions, and concerns."[12]  In the

correspondence, Mr. Burns expressed frustration that Ms. Gaily did not have any of her hours

cut, even though she was teaching three ESL levels.  He again complained that Mr. Roberts did

not have hours cut even though he lacked both seniority and a Master's Degree.  His email does

not mention age or gender discrimination, but Mr. Burns references "EEO complaints which is

[sic] currently in Federal court and moving forward."[13]

---

[8] *See id.*, Ex. B.

[9] Dkt. No. 20-1, Ex. V.

[10] Dkt. No. 20-1, Ex. V.

[11] *Id.*, Ex. D.

[12] *Id.*, Ex. D.

[13] *Id.*, Ex. D.

Paula Cummings, Ms. Adamson's secretary, testified that Ms. Adamson was upset by Mr. Burns's emails.[14]  Ms. Adamson later testified that she "received some e-mails with innuendo and threats," in which Burns "basically called me a liar and that I was not doing my job and a whole lot of other things."[15]

## III.  Termination of Mr. Burns

Tension between Mr. Burns and Ms. Adamson escalated in July 2010.  After receiving notice of a decrease in federal funding, Allison Tanner, the associate director of Granite Peaks, contacted Ms. Adamson and instructed her to reduce her staff by one teacher.  At that time, the staff consisted of five teachers: Mr. Burns, Ms. Black, Mr. Roberts, Ms. Gaily, and Ms. Hutchinson, who was on a temporary leave of absence.  After some consideration, Ms. Adamson selected Mr. Burns, who was notified of his release by voicemail on July 3, 2010.

Ms. Adamson testified that she considered a number of factors when she selected Mr. Burns.  First, she noted that Mr. Burns was the only teacher who failed to attend a staff meeting in which the curriculum for the coming year was discussed.[16]  Ms. Adamson compared the rates at which the five teachers retained students in their classes and determined that Mr. Burns consistently showed poor retention rates.  Ms. Adamson testified that one of the secretaries or clerks at the Kearns campus had heard a complaint about Mr. Burns from a student, although Ms. Adamson was unable to confirm the identity of either the student or the secretary.[17]  Another factor that Ms. Adamson considered was the length of time that teachers had been with Granite Peaks.  And seniority was the reason that Ms. Adamson purportedly favored Ms. Black (who

---

[14] Dkt. No. 19-2, Ex. M, at 7:1-8, 13:16.

[15] Dkt. No. 19-2, Ex. Q, at 49:7-17.

[16] *Id.*, Ex. Q, at 19:11-22:25.

[17] *Id.*, Ex. Q, at 22:13-25.

also had low retention rates) over Mr. Burns.[18]  Finally, Ms. Adamson stated that Mr. Burns allowed students to leave class early.  Overall, she testified that "there were a number of factors [] contributing to my decision."[19]

Mr. Burns disputes the relevance and the probability that these factors were the motivating considerations behind the decision to terminate his position.  Most importantly, he believes that retention rates were a poor means of teacher evaluation because he had been assigned to teach the most advanced ESL classes, Levels Five and Six, which historically have low retention rates.  Mr. Burns asserts that he was fired instead of Mr. Roberts because he was older, and that he was fired instead of Ms. Black because he was a man.  Ms. Adamson's secretary, Paula Cummings, believed that Ms. Burns's e-mail correspondence "had something to do with" Ms. Adamson's decision to select Mr. Burns for termination.[20]

## IV.    Events Post-Termination

During her deposition, Ms. Adamson characterized Mr. Burns as "difficult sometimes, but not – he wasn't – I'm not aware that he was belligerent to me."[21]  Martin Bates, Granite's Assistant Superintendent, characterized Mr. Burns's behavior as belligerent in a letter to the Utah Antidiscrimination & Labor Division.[22]

During the 2010-2011 program year, Granite Peaks reduced its staff from five to four full-teaching positions at the Kearns campus.[23]  Janalyn Biesinger and Ms. Hutchinson appear to

---

[18] *Id.*, Ex. Q, at 63:18-66:1.

[19] *Id.*, Ex. Q, at 65:22-23.

[20] *Id.*, Ex. M, at 13:10-12.

[21] *Id.*, Ex. Q, at 56:25-57:2.

[22] Dkt. No. 18-1, Ex. I.

[23] Dkt. No. 20-1, Ex. J.

have shared a teaching position during Fall 2010 and Winter 2011.[24]  At some point during

Winter 2011, Susan Thomas replaced Mr. Roberts.[25]  Ms. Adamson did not ask Mr. Burns to

apply for the replacement position.  Mr. Burns testified that he did not reapply after his

termination.[26]

 To date, Mr. Burns has filed at least twenty-five EEOC Charges of Discrimination.[27]

Granite admits that it received and had knowledge of five of Mr. Burns's EEOC Charges of

Discrimination, which are dated April 4, 2008, January 28, 2009, July 12, 2010, October 28,

2010, and June 23, 2011.[28]  The parties dispute the extent to which Granite Peaks or Ms.

Adamson possessed knowledge of prior Charges of Discrimination when taking the actions at

issue in this case.

## ANALYSIS

### I.     Standard of Review

 The court grants summary judgment when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."[29]  "A material fact is one that

might affect the outcome of the suit under the governing law, and a genuine issue is one for

which the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."[30]  When evaluating a motion for summary judgment, the court must "view the evidence

and make all reasonable inferences in the light most favorable to the nonmoving party."[31]

---

[24] Dkt. No. 19-2, Ex. J, at 7-8.

[25] *Id.*, Ex. J, at 8.

[26] *Id.*, Ex. Q, at 75:22-77:5; *see also* Dkt. 18-1, Ex.B, at 25:3-11.

[27] Dkt. 18-1, Ex. A, at 91:15-16.

[28] *See id.*, Ex. G.

[29] Fed. R. Civ. P. 56(a).

[30] *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (internal quotation marks and citation omitted).

[31] *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

## II.     Analysis of Claims Under the McDonnell Douglas Standard

Mr. Burns alleges that he was discriminated against in violation of Title VII of the Civil Rights Act of 1964 (Title VII) based on his gender.[32]  He also alleges that he was discriminated against based upon his age in violation of the Age Discrimination in Employment Act (ADEA).[33]  Finally, Mr. Burns alleges that Granite impermissibly retaliated against him for engaging in a protected activity under Title VII.  Both parties agree the *McDonnell Douglas* burden-shifting analysis applies to each of these claims.[34]

Under *McDonnell Douglas*, a plaintiff alleging discrimination or retaliation bears the initial burden of establishing the prima facie elements of a claim.[35]  If the plaintiff has done this, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the adverse employment action.[36]  If the defendant satisfies this burden, the burden again shifts to the plaintiff to show that the protected status was a determinative factor in the employment decision or that the employer's explanation for its decision was a pretext.[37]

### A.     Prima Facie Analysis

#### 1.     Gender Discrimination Claim

To establish a prima facie case of gender discrimination, Mr. Burns must show: (1) he is a member of a protected class; (2) he was qualified for the position or benefit at issue; (3) he was subjected to an adverse employment action; and (4) similarly situated employees were treated

---

[32] *See* 42 U.S.C. § 2000e.

[33] 42 U.S.C. § 621 *et seq.*

[34] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1278 (10th Cir. 2010); *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).

[35] *McDonnell Douglas Corp.*, 411 U.S. at 802.

[36] *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002).

[37] *Id.*

differently.[38]  Because Mr. Burns alleges a form of reverse discrimination, he must also "establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminate against the majority."[39]  Alternatively, a plaintiff "may produce facts sufficient to support a reasonable inference that but for plaintiff's status the challenged decision would not have occurred."[40]

The Tenth Circuit in *Argo v. Blue Cross & Blue Shield of Kansas, Inc.* illustrated the "stronger showing" required to support reverse discrimination claims.[41]  There, a male employee alleged that he had been subjected to persistent sexual harassment by a female manager and then terminated after filing an internal sexual harassment claim.[42]  The district court granted summary judgment to the employer after concluding that the employee failed to produce evidence of reverse discrimination against male employees.[43]  The Tenth Circuit upheld the decision, holding that the employee could not establish "background circumstances" indicative of reverse discrimination, because the employee failed to show there were no other male employees, that his position remained open after his termination, that the employee was replaced by a woman, or "a whit of statistical or even anecdotal evidence that men suffered adverse treatment as a class in the workplace."[44]  The Tenth Circuit also concluded that nothing in the record suggested a "temporal or causal connection" between the purported sexual harassment and the termination, because the incidents occurred long before tension between the employer and employee.[45]

---

[38] *Argo*, 452 F.3d at 1201.

[39] *Id.* (internal quotations marks and citations omitted).

[40] *Id.* at 1201 (internal quotation marks and citation omitted).

[41] *Id.*

[42] *Id.* at 1196-98, 1201.

[43] *Id.* at 1198-99.

[44] *Id.* at 1201-02.

[45] *Id.* at 1202.

Here, Mr. Burns points to four scenarios he contends support his reverse discrimination claim. The court finds that each falls short of satisfying the level of proof necessary to establish either background circumstances that suggest discrimination against a majority or facts sufficient to support a reasonable inference that the challenged decision would not have occurred but for Mr. Burns being male.

First, Mr. Burns argues that Ms. Adamson met with Ms. Black to improve her retention rates, whereas she did not meet with Mr. Burns. Mr. Burns also asserts that Ms. Adamson failed to inform him of the importance of retention criteria. The court concludes that these allegations fail to demonstrate reverse discrimination. Mr. Burns has not established that Ms. Adamson was required to disclose these criteria. More importantly, there is no evidence linking disclosure of this information to gender. For example, there is no competent evidence that Ms. Adamson explicitly provided these criteria to all of the female teachers but not to any of the male teachers. Indeed, Mr. Burns admits that Mr. Roberts understood the importance of retention rates, and the parties agree that the importance of student attendance was raised during staff meetings. As a result, a mere conversation between a supervisor and a female teacher does not give rise to an inference of reverse discrimination.

Second, Mr. Burns argues that Ms. Adamson's later hiring choices demonstrate a preference for women because Ms. Adamson hired female substitute teachers and Mr. Roberts's eventual replacement was a woman. Mr. Burns does not, however, bring forward any evidence that qualified males applied, were considered, and rejected for these positions, and he admits that he did not apply for the position after his termination.

Third, Mr. Burns contends that female teachers were allowed to pick their classes. Mr. Burns believes this is the case because Ms. Black stated that she was able to pick her classes

about 80 percent of the time. But Mr. Burns's theory is unpersuasive, because he misconstrues Ms. Black's testimony, which referred to the period of time before Ms. Adamson became the coordinator. In fact, Ms. Black later testified that she rarely was able to select the level she wanted to teach. And Mr. Burns argues that Mr. Roberts, a male teacher, was allowed to identify his class preference—a fact that undermines Mr. Burns's reverse discrimination claim.[46] In light of the undisputed testimony, the court cannot find that the testimony proffered by Mr. Burns establishes the type of unusual discrimination against a predominant group that characterizes reverse discrimination claims.

Fourth and finally, Mr. Burns argues that Ms. Adamson failed to terminate any of the female teachers, and that none of the replacement teachers in the following school year were male. But Mr. Burns does not dispute the fact that Mr. Roberts retained his position, and that Mr. Burns never applied for any of the substitute or replacement positions. Stated differently, the fact that Ms. Adamson's supervisor required her to terminate one employee does not prove reverse discrimination when a male teacher retained his position until voluntarily leaving at a later time. And Ms. Adamson's decision to hire substitute or replacement teachers from a group of female applicants does not demonstrate reverse discrimination when Mr. Burns neither applied nor presented proof that a single qualified male applicant was denied an opportunity.

In sum, Mr. Burns fails to present sufficient background circumstances to give rise to a reasonable inference of reverse gender discrimination.[47] As a result, Mr. Burns has not carried his burden of establishing a prima facie case of gender discrimination under Title VII.

---

[46] Mr. Burns also argues that Ms. Adamson allowed Mr. Roberts to pick the class of his choice. *See* Dkt. 19-1, at 3. Mr. Burns appears to have lifted Mr. Roberts's testimony out of context. *See id.*, Ex. N, at 7:18-8:5.

[47] *See, e.g., Held v. Ferrellgas, Inc.*, 505 F. App'x 687, 690 (10th Cir. 2012) (concluding former employee's belief in reverse gender discrimination was not objectively reasonable).

## 2.       *Age Discrimination Claim*

To establish a prima facie case of age discrimination under the ADEA, Mr. Burns must show: "(1) membership in a protected class and (2) an adverse employment action (3) that took place under circumstances giving rise to an inference of discrimination."[48]  Mr. Burns is over the age of forty and a member of a protected class.  Neither party disputes that Mr. Burns suffered an adverse employment action when Ms. Adamson selected him for the staff reduction.  The parties only dispute the third element of Mr. Burns's ADEA claim.  On the record here, the question presented is whether Granite treated Mr. Burns less favorably than Mr. Roberts because of his age.

Mr. Burns argues that he was treated differently than Mr. Roberts in a number of ways: (1) Mr. Roberts, unlike Mr. Burns, was informed of the importance of retention criteria; (2) Mr. Roberts was purportedly allowed to pick the section that he would teach; (3) Mr. Roberts was not assigned to classes with low retention rates; and (4) Ms. Adamson did not reduce Mr. Robert's teaching hours.[49]  Mr. Burns believes that these facts suggest that Ms. Adamson set him up to fail by assigning him to classes with historically low retention rates.

Granite, in contrast, argues that its use of retention rates constitutes a business judgment decision.  Granite further contends that Ms. Adamson moved every teacher up a level because students were attached to their teachers.  Granite maintains that Mr. Burns misconstrues testimony when he claims that other teachers were allowed to pick their classes.  Finally, Granite argues that Mr. Burns has not demonstrated that he was set up to fail because of his age.

Many of Granite's arguments are directed at the pretext analysis, rather than the adequacy of Mr. Burns's prima facie showing.  Although Granite relies primarily on an inapposite pretext

---

[48] *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012).

[49] Dkt. No. 19-1, at 18-21.

case, the court nevertheless concludes that Mr. Burns failed to present sufficient evidence of age discrimination to meet his threshold burden. Although direct evidence is not required under the *McDonnell Douglas* framework, a plaintiff must present sufficient facts to support a reasonable inference of discrimination based on age. None of Mr. Burns's arguments give rise to such an inference.

First, Mr. Roberts and Ms. Black both testified that Ms. Adamson discussed retention problems during staff meetings.[50] Presumably, Mr. Burns would have been informed of the importance of retention rates if he had attended these meetings. The court can draw no proper inference of discrimination when this information was provided to teachers during scheduled meetings, especially where Mr. Burns failed to attend every staff meeting. Second, Mr. Burns misconstrues testimony when he argues that Mr. Roberts was allowed to pick the section he wanted to teach.[51] Third, even if Mr. Roberts was assigned to classes with lower retention rates and his teaching hours were not reduced, Mr. Burns has failed to present any evidence that these circumstances were driven by or in any way related to the difference in age between Mr. Burns and Mr. Roberts. To the contrary, Ms. Adamson testified that she assigned classes based on the teacher's past history and attachment to students, and that the reduction in hours was driven by low attendance in the higher level courses.[52] If Ms. Adamson had testified that she assigned Mr. Roberts to classes with higher attendance because of his age, enthusiasm, or energy, perhaps the outcome would be different. But after considering the evidence submitted by the parties, the

---

[50] Dkt. No. 19-2, Ex. N, at 13:24-14:2; *id.*, Ex. O, at 27:22-28:2.

[51] Ms. Adamson denies allowing Mr. Roberts to pick his class. Mr. Roberts testified that Ms. Adamson asked for input on which classes he was comfortable teaching. The court concludes that the two portions of testimony are not sufficient to create a disputed issue of material fact, in part because they are consistent. For example, Mr. Burns has not shown that Mr. Roberts specifically picked and received Levels Three or Four. Even if Ms. Adamson asked Mr. Roberts which class he preferred, this does not mean that Ms. Adamson based her assignment on his comments.

[52] Dkt. No. 19-2, Ex. Q, at 31:15-19.

court cannot conclude that Mr. Burns identified circumstances that support a reasonable inference of discrimination.

For these reasons, the court concludes that Mr. Burns has failed to meet the third prong of his prima facie case for age discrimination. But even if Mr. Burns had presented evidence that adequately supported a prima facie case, the court concludes that his ADEA claim also fails for the additional reason that Mr. Burns cannot meet his burden of demonstrating pretext for the reasons discussed below.[53]

### 3. Retaliation Claim

"To establish a prima facie case of retaliation, a plaintiff must demonstrate (1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."[54]

The central issue here is whether Mr. Burns satisfies the third element.[55] "The causal-connection element of a prima facie retaliation claim requires the employee to show that the employer's motive for taking adverse action was its desire to retaliate for the protected activity."[56] While temporal proximity is relevant to causation, "[u]nless the termination is very closely connected in time to the protected conduct, the plaintiff will need to rely on additional evidence beyond mere temporal proximity to establish causation."[57]

---

[53] *Infra* Part II.C.

[54] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).

[55] The parties appear to agree that termination constitutes a materially adverse action. While neither party provides in-depth analysis of whether the emails in this case constitute protected activity, the court concludes that Mr. Burns's electronic communications satisfy the first prima facie element, because they specifically reference charges of discrimination. *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008).

[56] *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003).

[57] *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997).

Mr. Burns argues that Granite retaliated against him by terminating his position after he sent emails protesting Ms. Adamson's decision to cut his teaching hours. On May 27, 2010, Mr. Burns sent an email that referenced preferential treatment of other employees, claimed that the preferential treatment constituted discrimination, and indicated that Mr. Burns intended to file an "EEO complaint."[58] Mr. Burns sent Ms. Adamson a second email on June 9, 2010, in which he referenced pending "EEO complaints . . . in Federal Court and moving forward." Less than a month later, Mr. Burn was notified of his termination from the Granite Peaks program.

Granite argues that Mr. Burns fails to establish a causal connection. Granite first argues that it never received notice of any charges of discrimination between January 28, 2009 and July 12, 2010.[59] Granite acknowledges that Ms. Adamson received emails from Mr. Burns. But Granite argues that Mr. Burns has failed to show that the termination could not have been caused by other factors, including the threatening or insubordinate tone of the emails.

The court concludes that Granite's argument is not persuasive, because employees may satisfy the third prima facie element by demonstrating temporal proximity between the protected activity and the adverse action.[60] Here, Mr. Burns met his burden by proffering two instances of communication to Ms. Adamson that referenced protected opposition within two months of his termination.[61] Accordingly, the court turns to the second prong of *McDonnell Douglas*.

---

[58] Dkt. No. 20-1, Ex. V, at 7.

[59] Dkt. No. 18, at 17.

[60] *See Annett v. Univ. of Kansas*, 371 F.3d 1233, 1240 (10th Cir. 2004) (acknowledging that temporal proximity of two months and one week satisfied prima facie burden).

[61] *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).

### B.     Legitimate, Non-Discriminatory Reasons for Employer Action

"Once a prima facie case is established, the burden shifts to the [employer] to articulate a legitimate, nondiscriminatory reason for its action."[62]

Granite proffers two reasons for the alleged disparate treatment prior to Mr. Burns's termination. First, Ms. Adamson assigned Mr. Burns to teach upper-level classes because of student-teacher attachment issues. Second, Ms. Adamson asked Ms. Black and Mr. Burns to share hours for the upper-level classes because of the number of students. The court concludes that both of these explanations are legitimate, non-discriminatory reasons for Granite's conduct.

Granite further proffers several reasons supporting Mr. Burns's discharge. First, Granite experienced a decrease in funding that necessitated a reduction in the number of teaching positions. Second, Mr. Burns experienced historically low student retention rates. Third, other teachers had accrued more seniority. Fourth, Mr. Burns missed a key staff meeting during which Ms. Adamson discussed curriculum for the upcoming year. Fifth, Mr. Burns received a student complaint, the exact details of which are unknown. Sixth, Mr. Burns released students from class early in violation of Granite's policies. And finally, there was tension between Mr. Burns and Ms. Adamson, including his dislike of her rigid managerial style. Taken together, the court concludes that this multi-factored explanation of reasons satisfies Granite's obligation to come forward with a legitimate, non-discriminatory justification for Mr. Burns's discharge.

Granite has satisfied the second prong of the *McDonnell Douglas* test. The burden therefore shifts to Mr. Burns to demonstrate that Granite's proffered explanations for its actions are pretextual. As discussed below, the court concludes that Mr. Burns has failed to carry his burden for the final step of *McDonnell Douglas*.

---

[62] *Wilkerson v. Shinseki*, 606 F.3d 1256, 1266 (10th Cir. 2010).

## C.     Pretext

When the burden shifts to the employee to demonstrate pretext, "an employee must show there is enough inconsistency or implausibility in his employer's stated explanation for the firing that a reasonable trier of fact could find it unworthy of belief."[63]  A plaintiff satisfies this burden by presenting evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[64]  When evaluating the sufficiency of this evidence, courts look to a number of factors, "includ[ing] the strength of the [employee's] prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered."[65]

The Tenth Circuit has cautioned that "a difference in treatment between two employees by the same supervisor does not automatically give rise to a Title VII or ADEA claim."[66]  Often, these differences may be attributed to changes in supervisors, temporal shifts in enforcement, or simply human relationships.[67]  When a plaintiff alleges that discriminatory treatment supports a showing of pretext, "it is up to the plaintiff to establish not only that differential treatment occurred, but also to rule out nondiscriminatory explanations for the differential treatment."[68]

---

[63] *Roberts v. Int'l Bus. Machines Corp.*, 733 F.3d 1306, 1309 (10th Cir. 2013).

[64] *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1280 (10th Cir. 2010) (quoting *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir.2005)).

[65] *Id.* (alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148-149 (2000)).

[66] *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007).

[67] *See E.E.O.C. v. Flasher Co., Inc.,* 986 F.2d 1312, 1320 (10th Cir. 1992).

[68] *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1121 (10th Cir. 2007) (quoting *Flasher Co.,* 986 F.2d at 1320) (observing that not all differential treatment supplies the basis for a Title VII or ADEA claim, because individual circumstances or mitigating factors may explain the different in treatment).

Mr. Burns argues that Granite's asserted reasons for termination are pretextual.[69]  Mr. Burns raises four primary arguments.  Because Mr. Burns does not distinguish between his claims or legal theories when discussing pretext, the court concludes that Mr. Burns's pretext arguments are identical for the gender discrimination, age discrimination, and retaliation claims. The court will therefore analyze Mr. Burns's attempt to satisfy his burden by looking at each of his four arguments, rather than engaging in a separate analysis for each cause of action.

First, Mr. Burns argues his termination was pretextual because he believes that the budget did not require Ms. Adamson or Ms. Tanner to dismiss one of the teachers.  In support of this argument, Mr. Burns argues that Granite Peaks could have combined classes and notes that it hired three additional ESL staff members the following fall: Janalyn Biesenger, Jennifer Hutchinson, and Constance Linkmeyer.[70]  Mr. Burns further maintains that Ms. Adamson used the budget cuts as an excuse to terminate his position, while at the same time reserving a position for a female teacher on temporary leave.[71]  Mr. Burns argues that the merging of two positions during the next year was intended to conceal discriminatory conduct towards Mr. Burns.[72]

The court disagrees.  It is undisputed that Granite Peaks received notification of an approximately $24,000 decrease in federal funding for its ESL program for the 2010-2011 school year shortly before Mr. Burns's termination.[73]  Based on the decrease in funding, Ms. Tanner, whose interactions with Mr. Burns were limited, instructed Ms. Adamson to terminate one of the teaching positions.  At the time of his termination, Granite Peaks had five teachers: Mr. Burns, Ms. Black, Mr. Roberts, Ms. Gaily, and Ms. Hutchinson, who was on a temporary leave.  During

---

[69] Dkt. No. 20, at 30-33.

[70] Dkt. 19-1, at 26.

[71] Dkt. No. 25, at 10.

[72] *Id.* at 10-11.

[73] *See* Dkt. 19-2, Ex. J, at 4.

Fall 2010, months after the termination, Ms. Adamson invited an existing substitute teacher, Ms. Biesenger, to share a class with Ms. Hutchinson.  In Fall 2010, Ms. Adamson also replaced an existing teacher, Ms. Gaily, with an experienced past employee, Ms. Linkmeyer.  But even after these shifts in personnel, Granite Peaks continued to have four full-time teaching positions after the budget cuts instead of five.  And Mr. Burns admits that he did not re-apply to teach at Granite Peaks following his termination.  In short, Mr. Burns's theories of pretextual budget decisions or staffing shifts do not comport with the facts.[74]  A reasonable juror could not find that Granite's stated reason for the termination and subsequent personnel shifts are "unworthy of belief."

Furthermore, to the extent that Mr. Burns asks the court to conclude that Ms. Adamson erred by terminating Mr. Burns rather than Ms. Hutchinson, or by merging two positions during the subsequent semester, Mr. Burns asks this court to impermissibly substitute its judgment for that of an after-school program coordinator who possessed a much clearer understanding of the needs of students and her teachers during Fall 2010.  The Tenth Circuit instructs this court to exercise caution when asked to substitute its business judgment for that of an employer who possesses an honest, good faith belief in the need for a particular employment decision.[75]

Second, Mr. Burns challenges Ms. Adamson's use of retention rates when determining which teacher to terminate.  According to Mr. Burns, Ms. Adamson should have terminated Ms. Black because her retention rates were worse than Mr. Burns's rates.  Mr. Burns also asserts that Ms. Adamson's use of retention is incredulous, because Ms. Adamson never observed Mr. Burns in the classroom, possessed no "concrete evidence" of his teaching style, and used retention rates

---

[74] The court further notes that several of Mr. Burns's arguments center on events occurring months after the initial termination.  "An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998).

[75] *See Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) ("The reason for this rule is plain: our role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments.").

from the middle of the semester.[76] Mr. Burns also appears to argue that retention rates were pretextual, because upper-level courses necessarily had lower retention rates.

Mr. Burns's mischaracterization of deposition testimony relating to retention rates does not support a reasonable inference that consideration of the rates was pretextual. In support of his argument, Mr. Burns relies primarily on Ms. Adamson's testimony, which he takes out of context.[77] When viewed in its entirety, Ms. Adamson testified that she based her decision on a number of factors, including but not limited to retention. While Ms. Adamson acknowledged Ms. Black experienced retention issues, Ms. Black's seniority and experience weighed against her termination when compared to Mr. Burns. And documents produced post-termination suggest that retention rates for Ms. Black and Mr. Burns varied over time.[78] With this context in mind, Ms. Adamson's testimony reflects a good faith attempt to evaluate legitimate bases for selecting one teacher among several for termination.[79] Even if the court could substitute its judgment for the factors used by Ms. Adamson, the court concludes that Mr. Burns has not demonstrated that her consideration of retention, as one of many factors, is unworthy of belief.

Third, Mr. Burns briefly and indirectly challenges Ms. Adamson's consideration of seniority. The court concludes that Ms. Adamson's consideration of a teacher's years of experience teaching courses in the ESL program does not demonstrate pretext.

Fourth, Mr. Burns argues that Ms. Adamson's consideration of attendance at staff meetings was pretextual because staff members testified that attendance was optional. While the

---

[76] *See* Dkt. No. 19-1, at 25-26.

[77] *See* Dkt. No. 21, at 19-20.

[78] Dkt. No. 19-2, Ex. H, at 2. The court recognizes that the relevant inquiry is the "facts as they appear to the person making the decision," but nevertheless finds that the subsequently produced documents provide additional support for Ms. Adamson's understanding of retention problems at the time of the termination. *Rivera v. City & Cnty. of Denver,* 365 F.3d 912, 924-25 (10th Cir. 2004).

[79] Dkt. No. 19-2, Ex. Q, at 30-33.

parties dispute whether attendance was optional or mandatory, the court concludes that the parties' difference of opinion is immaterial. Even assuming attendance was optional, Ms. Adamson could properly consider which teachers attended and participated in staff meetings. A supervisor could possess a good faith belief of a teacher's interest, commitment, and effectiveness based on that teacher's understanding of the curriculum and participation in staff meetings, even if the meetings were entirely voluntary. This is especially true where, as here, every other teacher in the department appeared to have attended the staff meetings. Thus, even if the meetings were optional, a reasonable fact finder could not find that Ms. Adamson's reflection on Mr. Burns's failure to attend important staff meetings was unworthy of belief.

Fifth, Mr. Burns argues that Ms. Adamson's consideration of his practice of allowing students to leave early was pretextual because other teachers purportedly allowed their students to leave class early. Mr. Burns correctly asserts that other teachers may have excused their students early. However, the court concludes that this does not rise to the level of pretext. Consideration of his teaching practices appears to have been but one of several legitimate, non-discriminatory bases for selecting Mr. Burns for termination.

Sixth, Mr. Burns challenges Granite's consideration of his personality and an unidentified student complaint. Mr. Burns argues that Mr. Bates erroneously described him as belligerent in a letter following his termination, and that Ms. Adamson never used this term. Mr. Burns also argues that the student who complained about his teaching style was never identified. Neither of these facts creates a basis for concluding that Granite's purported reasons for his termination were pretextual. As noted above, Mr. Burns disliked Ms. Adamson's managerial style, and Ms. Adamson described Mr. Burns as "difficult" during her deposition. The record clearly reflects the tension between Ms. Adamson and Mr. Burns. As a result, the court concludes that the

dispute over the use of the term "belligerent" is not material.  Furthermore, Ms. Adamson's cursory consideration of Mr. Burns's willingness to work with his supervisor and the existence of a past student complaint simply does not appear to have been a pretext for discrimination within the meaning of Title VII or the ADEA.

The court makes three additional observations.  First, in his discussion of pretext, Mr. Burns alludes to the relatively short period of time between his emails and termination.  The Tenth Circuit has held, however, "that close temporal proximity is a factor in showing pretext, yet is not alone sufficient to defeat summary judgment."[80]  In *Annett*, for example, an employee's mere mention of a lawsuit against the employer during a committee meeting did not prevent the Tenth Circuit from concluding that the plaintiff failed to establish pretext, because the employee failed to proffer additional circumstantial evidence to undermine the purported justification for the employer's hiring decision.[81]  Here, Mr. Burns has failed to present additional circumstantial evidence of pretext beyond temporal proximity.

Second, the court recognizes that in the Tenth Circuit a plaintiff may show pretextual discrimination under the ADEA by proving that age was a determinative factor in the adverse employment action.[82]  Courts have adopted this standard because the ADEA itself does not require the plaintiff to prove age was the "sole motivating factor in the employment decision," and an employer may be liable "if other factors contributed to its taking an adverse action, as long as 'age was the factor that made a difference.'"[83]  Here, however, Mr. Burns has not

---

[80] *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1240 (10th Cir. 2004) (distinguishing temporal proximity analysis in prima facie case from pretext analysis).

[81] *Id.* at 1241-42.

[82] *Wilkerson v. Shinseki*, 606 F.3d 1256, 1267 (10th Cir. 2010).

[83] *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1277 (10th Cir. 2010) (internal quotation marks and citations omitted ); *cf. Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009); *see, e.g., Wilkerson*, 606 F.3d at 1267 (concluding that an employee failed to satisfy the third-prong by proffering "a one time, offhand, and fairly

proffered any evidence that age was a determinative factor.  Indeed, for the reasons already discussed, the decision to terminate his position was supported by a number of factors.

Third, Mr. Burns does not specifically or substantively address in his briefing whether Ms. Adamson's pre-termination conduct towards other teachers was pretextual.  As discussed above, Mr. Burns argues that other teachers were given class preferences or instructed on the importance of retention rates.  But as discussed above, Ms. Adamson has explained that her class assignments were made on the basis of teacher attachment, and the record reflects that retention rates were discussed during staff meetings.  To the extent that Mr. Burns's claims are based on pre-termination conduct, his cursory treatment of the issue does not rise to the level of satisfying his burden of demonstrating that Granite's purported reasons were false or unworthy of belief.

In sum, the court concludes that Granite considered a range of factors, several of which appear to fall well within the discretion of a school program administrator faced with a difficult personnel decision, in determining which of the teachers would be terminated due to budget cuts in Spring 2010.  Mr. Burns has not carried his burden of demonstrating that these factors, either alone or in the aggregate, were pretextual.[84]

## CONCLUSION

For the reasons stated, Granite's Motion for Summary Judgment is **GRANTED**.  (Dkt. No. 17.)  Mr. Burns's Motion for Summary Judgment is **DENIED**.  (Dkt. No. 19.)  The Clerk of Court is directed to enter judgment in favor of Granite and to close the case.

**SO ORDERED** this 14th day of October, 2014.

---

ambiguous comment by a supervisor . . . who did not even make the ultimate decision with respect to his employment").

[84] *See Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) ("The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." (internal quotation and citations omitted) (alteration in original)).

BY THE COURT:

_____

ROBERT J. SHELBY
United States District Judge